1
 2026 CO 17 The People of the State of Colorado, Plaintiff-Appellant: v. Dakotah J. Lulei. Defendant-Appellee: No. 25SA146Supreme Court of Colorado, En BancMarch 30, 2026
          
 Interlocutory Appeal from the District Court District Court,
 City and County of Denver, Case No. 24CR5907 Honorable Eric
 Johnson, Judge
 
 
          Order
 Reversed
 
 2
 
          
 Attorneys for Plaintiff-Appellant: John Walsh, District
 Attorney, Second Judicial District Jeff M. Van der Veer,
 Senior Deputy District Attorney Anya Havriliak, Deputy
 District Attorney Denver, Colorado
 
 
          
 Attorneys for Defendant-Appellee: Megan A. Ring, Public
 Defender Robert Swestka, Deputy Public Defender Robert
 Halpern, Deputy Public Defender Denver, Colorado
 
 3
 
           CHIEF
 JUSTICE MÁRQUEZ delivered the Opinion of the Court, in
 which JUSTICE BOATRIGHT and JUSTICE SAMOUR joined. JUSTICE
 BLANCO concurred in part and concurred in the judgment.
 JUSTICE GABRIEL, joined by JUSTICE HOOD and JUSTICE
 BERKENKOTTER, dissented.
 
 4
 
          
 MARQUEZ CHIEF JUSTICE
 
 
          
 OPINION
 
 
          ¶1
 The People bring this interlocutory appeal under C.A.R. 4.1,
 challenging a Denver District Court order suppressing
 Defendant Dakotah J. Lulei's statements to law
 enforcement under Edwards v. Arizona, 451 U.S. 477,
 484-85 (1981) (holding that when an accused who is subject to
 custodial interrogation has invoked their right to counsel
 under Miranda v. Arizona, 384 U.S. 436 (1966),
 police may not reinitiate interrogation until counsel has
 been made available). At the suppression hearing, the
 district court acknowledged that the right to counsel under
 Miranda applies to custodial interrogation. It
 further concluded (consistent with defense counsel's
 position at the hearing) that Lulei was not in custody when
 he invoked his right to counsel as police attempted to advise
 him of his Miranda rights. Nevertheless, the
 district court ruled that Lulei's subsequent (albeit
 voluntary) statements must be suppressed under
 Edwards because the police did not scrupulously
 honor his request for a lawyer and instead reinitiated
 interrogation.
 
 
          ¶2
 We conclude that the district court erred as a matter of law
 when it concluded that Lulei's invocation of the right to
 counsel outside of a custodial interrogation setting was
 nevertheless effective because police had attempted to advise
 him of his Miranda rights. Because our review of the
 record confirms the trial court's finding that Lulei was
 not in custody when he requested the presence of an attorney,
 Miranda and Edwards are inapplicable here
 and the district court
 
 5
 
 therefore erred in suppressing Lulei's statements under
 those cases. Accordingly, we reverse the district court's
 order and remand the case to the district court for further
 proceedings.
 
 
          I.
 Facts and Procedural History
 
 
          A.
 The Incident and Subsequent Police Interview
 
 
          ¶3
 Late one evening, Lulei called 911 to report that his motel
 roommate was unconscious because of a possible
 overdose.[1] When police arrived, they saw emergency
 medical personnel performing CPR on the roommate, who died
 shortly thereafter. At that point, Lulei was not a suspect,
 nor did officers suspect foul play. Officers took Lulei's
 statement, processed the scene, and released the room back to
 Lulei.
 
 
          ¶4
 The following morning, Detective Bolton of the Denver Police
 Department ("DPD") attended the roommate's
 autopsy. The results of the autopsy, along with evidence of
 additional 911 calls the evening before, led law enforcement
 to suspect there had been a disturbance between the men.
 Detective Bolton and another detective decided to reinterview
 Lulei as a witness. That afternoon, officers brought Lulei to
 police headquarters, handcuffing him in front of his body
 during
 
 6
 
 transportation for officer safety pursuant to DPD policy.
 Lulei was not under arrest at that point.
 
 
          ¶5
 At police headquarters, Lulei waited in the lobby until he
 was brought into an interview room.[2] During the interview, Lulei
 was not handcuffed, and he had his cell phone and a water
 bottle with him. He took the seat closest to the door, which
 was unlocked. Detective Bolton entered, wearing a shirt and
 tie and visibly carrying a bolstered firearm. He sat across a
 table from Lulei.
 
 
 Det. Bolton: What's up man?
 
 
 Lulei: Oh,. . ., it's this guy!
 
 
 Det. Bolton: This guy. Got your water I see?
 
 
 Lulei: Oh thank you big sexy.
 
 
 Det. Bolton: I got you, bro. [Sitting.] Alright.
 
 
 Lulei: Alright, so, uh, we're going to keep this under
 two minutes.
 
 
 Det. Bolton: Two minutes huh?
 
 
 Lulei: Oh, yeah, cuz, you have my statement right?
 
 
 Det. Bolton: Ah, dude, listen -
 
 
 Lulei: So, you have my statement, [slaps the desk] that's
 what we're going by. [Gets up.] Thank you, have
 
 7
 
 a good day. [Opens the door but remains in the room.]
 
 
 Det. Bolton: Wait, wait, are you for real? Wait, wait, hold
 on -
 
 
 Lulei: I am for real -
 
 
 Det. Bolton: You can't leave -
 
 
 Lulei: I am for real- [Stays in the room; closes the door and
 goes back to stand by his chair.]
 
 
 Det. Bolton: You can't leave until the cop gets here;
 hold on, I've got to get you out of here.
 
 
 Lulei: No, no, you have my statement -
 
 
 Det. Bolton: I don't have your statement.
 
 
 Lulei: The police have it, that's what happened, and
 I'm free to go now.
 
 
          ¶6
 Lulei became agitated, telling Detective Bolton that he had
 been made to wait for over an hour and a half. Detective
 Bolton maintained a calm tone, told Lulei that it had not
 been that long, and that he just needed "to make sure
 we're all on the same page." Lulei agreed to stay
 and sat.
 
 
 Det. Bolton: So, if you could give me just a little bit more
 of your time, I would appreciate it.
 
 
 Lulei: Alright, so, here's the deal, here's the deal,
 here's the deal- [Takes a cell phone out of his pocket.]
 
 
 Det. Bolton: I've been pretty smooth with you.
 
 
 Lulei: You have been so that's why I'm -
 
 
 Det. Bolton: Let's just start from scratch, and get this
 interview done, and be done.
 
 8
 
 Lulei: Yep, and then uh . . . [Sets timer on cell phone and
 puts phone on the desk.]
 
 
 Det. Bolton: What do you want to show me?
 
 
 Lulei: You have six minutes.
 
 
 Det. Bolton: Six minutes? How'd you come up with that
 number?
 
 
 Lulei: Just cuz. You're wasting time.
 
 
 Det. Bolton: Alright buddy. Well listen, first of all,
 you're all the way down here at the police station, okay,
 and I know you talked to the cops a few times. I just have a
 couple follow-up questions for you really quick.
 
 
 Lulei: Keep going with it. Yeah.
 
 
 Det. Bolton: Alright. In order to do that, I want to read you
 your [Miranda] advisement form, alright? That way
 you feel protected, I feel protected, we all know we're
 on the same page, okay? I'll go through it line by line
 for you. But that's just, reading your rights. Have you
 ever had your rights read to you before? [Turns form toward
 Lulei.]
 
 
 Lulei: [Takes advisement form; reads.] Oh, so I'm allowed
 to have a lawyer present for this?
 
 
 Det. Bolton: Absolutely.
 
 
 Lulei: Oh. . . yeah, let's reschedule this when I have a
 lawyer present.
 
 
 Det. Bolton: Okay, we can do that.
 
 
 Lulei: [Gets up and walks toward the door.] Yeah, reschedule
 this for when I have a lawyer present.
 
 9
 
 Det. Bolton: Alright, sounds good.
 
 
 Lulei: And we'll do it at a time where you don't make
 me wait.
 
 
 Det. Bolton: [Stands.] Well, listen man, things take time.
 
 
 Lulei: [Opens the door.]
 
 
 Det. Bolton: Hold on one second, let me get the officer so we
 can get you transported back.
 
 
 Lulei: [Looking out into the hallway.] This guy right here?
 
 
 Det. Bolton: Yep, absolutely.
 
 
 Lulei: Oh, one hundred percent.
 
 
 Det. Bolton: Alright, let me chat with him for a second, and
 I'll get you out of here in just a second, okay?
 
 
 Lulei: No problem, and then, uh, you know, I want a lawyer
 present next time. And next time, I'm not waiting ....
 
 
          ¶7
 Detective Bolton left the interview room and closed the door.
 After conferring with Detective Sandoval in the hall, they
 decided that they had enough information to arrest Lulei.
 Detective Bolton, Detective Sandoval, and a uniformed officer
 entered the interview room. The officer held out handcuffs
 and asked Lulei to turn around.
 
 
 Lulei: What? Officer: I'm just gonna put the cuffs on
 you; we did this before.
 
 
 Lulei: But you all put it on in front of me on the way here.
 
 10
 
 Det. Sandoval: We did, yes. Not now.
 
 
 Lulei: What's going on now?
 
 
 Det. Bolton: Well, Dakotah, I tried to talk to you, get your
 side of the story. Right now, you're going to be
 arrested, okay?
 
 
 Lulei: What the . . . ? For what?
 
 
 Det. Sandoval: For murder.
 
 
 Lulei: Oh, dude, no. Like, let's talk this out then.
 Dude, like, no.
 
 
 Det. Sandoval: Nope, you had your chance, and you asked for a
 lawyer. We can't do it now.
 
 
 Det. Bolton: I tried to talk to you smoothly, man, and hear
 your side of it. We have some serious questions.
 
 
 Lulei: Alright, I'll rescind that then. I have serious -
 like, get answers then, dude. Like come on, like, don't.
 . . arrest me right now. I have my . . . motel paid for, for
 the next two weeks. I have to go to work on Monday. Like,
 I'm down to talk to you. Like, dude, like don't. . .
 detain me ... I thought I was going to be free to go after
 this.
 
 
 Det. Sandoval: Well, no one told you you were free to go
 after this -
 
 
 Det. Bolton: No one told you that, and also, I tried to get
 your side of the story and figure it out, man, and you
 didn't want to talk.
 
 
 Lulei: I'll talk to you now, man.
 
 
          ¶8
 The officer escorted Lulei, still handcuffed, to a holding
 cell. Around twenty minutes later, Detective Bolton brought
 Lulei back to the interview room. After
 
 11
 
 receiving a full Miranda advisement, Lulei signed a
 form waiving his rights. During the approximately
 two-and-a-half-hour interview that followed, Lulei made
 incriminating statements.
 
 
          B.
 The Suppression Hearing
 
 
          ¶9
 Lulei later moved to suppress his statements made to
 Detective Bolton, arguing that (1) officers failed to honor
 his invocation of the right to counsel and (2) his subsequent
 statements to the police were involuntary.
 
 
          ¶10
 At the suppression hearing, defense counsel acknowledged that
 the case law in this context generally involves individuals
 who are under arrest, and that "[h]ere we don't have
 that situation." Rather, Lulei "was told he
 wasn't under arrest" and "was brought as a
 witness to make a statement." Defense counsel also
 argued that "[w]hat make[s] this situation unique"
 is that Lulei had been told he could leave after invoking the
 right to counsel, and moments later police arrested him for
 murder. Defense counsel contended that this amounted to
 police coercion because it prompted Lulei to rescind his
 request for counsel and proceed with the interview.
 
 
          ¶11
 The district court ruled on the motion from the bench. In its
 findings, the court accepted - and pointed out that the
 defense accepted - that Lulei was not in custody when he was
 brought to the police station. The district court then
 acknowledged that Miranda applies to custodial
 interrogation. The court
 
 12
 
 continued, "If everyone has confessed he was not in
 custody initially does it even really matter that he says I
 want a lawyer? I'm going to say yes. He was given his
 Miranda rights. He clearly, unambiguously invoked
 his right[] to have an attorney."
 
 
          ¶12
 The court then found that the police failed to scrupulously
 honor Lulei's request for an attorney when they arrested
 him and reinitiated interrogation. It therefore granted
 Lulei's motion to suppress under Edwards because
 the police failed to honor Lulei's invocation of the
 right to counsel. The court also concluded that Lulei's
 subsequent statements to the police were voluntary and there
 was no coercive police conduct. The court emphasized that it
 was not suppressing Lulei's statements on voluntariness
 grounds.
 
 
          ¶13
 After the court ruled, the People asked the court to clarify
 if it was finding that Lulei was not in custody when he was
 initially brought to the interview room. The court confirmed
 that "the evidence has established that when he was
 brought to the police station he was not in custody,"
 but that the detective tried to read Lulei his
 Miranda rights and Lulei invoked his right to
 counsel. The court then reiterated that it was suppressing
 Lulei's statements because Lulei "asked for his
 right for the attorney and he is not the one that
 reinitiated."
 
 13
 
          C.
 The People's Appeal
 
 
          ¶14
 After the suppression hearing, the People brought this
 interlocutory appeal under C.A.R. 4.1 seeking review of the
 district court's suppression ruling.[3]
 
 
          ¶15
 In their initial briefing to this court, the People focused
 their arguments on the trial court's finding that the
 police violated Edwards by reinitiating
 interrogation after Lulei unambiguously invoked the right to
 counsel. The People contested this finding, arguing that when
 Lulei asked after being handcuffed, "What's going on
 now?" the detectives' comments did not amount to
 interrogation.
 
 
          ¶16
 At oral argument, however, the People also pointed out that
 Lulei was not in custody when he asserted a right to counsel,
 and therefore he was not entitled to protections under
 Edwards. When offered an opportunity to respond on
 this point, defense counsel acknowledged that co-counsel who
 argued the motion had "conceded that point," and
 that, "at the time of the invocation [Lulei was] not per
 se in custody." Defense counsel later reiterated this
 point,[4] but argued that
 
 14
 
 Detective Bolton s effort to administer the Miranda
 advisement effectively triggered Lulei's Miranda
 rights regardless of his custodial status.
 
 
          ¶17
 After oral argument, Lulei requested leave to file
 supplemental briefing on the following issues:
 
 
 (1) Whether the prosecution waived any argument that Mr.
 Lulei was not in custody at the time of the invocation of the
 right to counsel.
 
 
 (2) Whether Mr. Lulei was, in fact, in custody at the time he
 invoked his right to counsel based on the totality of the
 circumstances, including the fact that he had been advised of
 his Miranda rights.
 
 
 (3) Whether the sum total of police conduct rendered Mr.
 Lulei's subsequent Miranda waiver involuntary.
 
 
          ¶18
 We granted Lulei's request and ordered both parties to
 submit simultaneous supplemental briefing on the above
 issues. Having received this briefing, we now turn to our
 analysis.
 
 
          IL
 Jurisdiction and Standard of Review
 
 
          ¶19
 Under section 16-12-102(2), C.R.S. (2025), and C.A.R. 4.1,
 the prosecution may immediately appeal a district court's
 order granting a defendant's pretrial motion to suppress
 evidence.[5] People v. Torres, 2026 CO 15,
 ¶ 17__,P.3d__.
 
 
          ¶20
 "When reviewing a lower court's decision to suppress
 statements made by a defendant, the question before the court
 is a mixed issue of law and fact."
 
 15
 
 People v. Kutlak, 2016 CO 1, ¶ 13, 364 P.3d
 199, 203. We defer to a district court's factual findings
 if there is sufficient record evidence, and we review the
 legal effect of those findings de novo. People v.
 Cerda, 2024 CO 49, ¶ 22, 559 P.3d 206, 212.
 "[W]here the statements sought to be suppressed are
 audio- and video-recorded, and there are no disputed facts
 outside the recording controlling the issue of suppression,
 we are in a similar position as the trial court to determine
 whether the statements should be suppressed." People
 v. Madrid, 179 P.3d 1010,1014 (Colo. 2008). "[W]e
 may undertake an independent review of the audio or video
 recording to determine whether the statements were properly
 suppressed in light of the controlling law."
 Kutlak, ¶ 13, 364 P.3d at 203.
 
 
          III.
 Analysis
 
 
          ¶21
 In Miranda, the United States Supreme Court
 "declared that an accused has a Fifth and Fourteenth
 Amendment right to have counsel present during custodial
 interrogation." Edwards, 451 U.S. at 482. In
 Edwards, the Court took steps to safeguard this
 Fifth Amendment right to counsel, holding that "it is
 inconsistent with Miranda and its progeny for the
 authorities, at their instance, to reinterrogate an accused
 in custody if he has clearly asserted his right to
 counsel." Id. at 485.
 
 
          ¶22
 Because the rule in Edwards serves to protect the
 right to counsel recognized in Miranda, and because
 the right to counsel recognized in Miranda applies
 only in the context of custodial interrogation, the rule in
 Edwards applies only when the
 
 16
 
 accused (1) is in custody, (2) is subject to interrogation,
 and (3) unambiguously invokes their right to counsel. See
 Miranda, 384 U.S. at 444-45; Edwards, 451 U.S.
 at 484-85; Smith v. Illinois, 469 U.S. 91, 95
 (1984). Indeed, the Court has observed that Miranda
 and Edwards apply "only in the context of
 custodial interrogation," and that "[i]f the
 defendant is not in custody then those decisions do not
 apply." Montejo v. Louisiana, 556 U.S. 778, 795
 (2009).
 
 
          ¶23
 Here, the People seek review under C.A.R. 4.1, asking us to
 determine whether the trial court erred in suppressing
 Lulei's statements under Edwards. We first
 address whether we may consider the issue of custody in this
 case, given that the People did not argue this point in their
 initial briefing. We conclude that under our decision in
 Kutlak, we may do so because a defendant's
 custodial status is an issue antecedent to and ultimately
 dispositive of the trial court's Edwards
 analysis before us on appeal. Next, we independently review
 the audio- and videorecorded interrogation and confirm that
 Lulei was not in custody when he asked for a lawyer.
 Because Lulei's Fifth Amendment right to counsel had not
 attached, and because Detective Bolton's initial,
 attempted Miranda advisement did not alter
 Lulei's noncustodial status, we conclude that
 Edwards does not apply here. We hold that the
 district court therefore erred in suppressing Lulei's
 statements on the basis that police ran afoul of
 Edwards by reinitiating interrogation after Lulei
 requested an attorney.
 
 17
 
          A.
 Consideration of Custody as an Antecedent Issue
 
 
          ¶24
 We first address whether we may consider the threshold issue
 of Lulei's custodial status in resolving this appeal.
 
 
          ¶25
 Lulei argues that the People waived the issue of custody, and
 because it has not been properly presented, we should decline
 to consider it. He further contends that by focusing their
 initial briefing on whether police reinitiated interrogation
 under Edwards, the People effectively conceded that
 he was in custody for purposes of this appeal.
 
 
          ¶26
 The People counter that a party's omission of a
 particular legal argument when addressing an issue is not a
 "waiver," but rather, that such an omission
 implicates the party presentation principle. They further
 argue that the party presentation rule does not constrain a
 court's fundamental obligation to ascertain controlling
 law. See Dan Ryan Builders, Inc. v. Crystal Ridge Dev.,
 Inc., 783 F.3d 976, 980 (4th Cir. 2015). Here, the
 People maintain, we may consider custody as antecedent to the
 question of whether Lulei effectively invoked his right to
 counsel under Miranda.
 
 
          ¶27
 It is true that we typically refuse to address issues or
 arguments on appeal that have been waived or abandoned.
 See, e.g., Moody v. People, 159 P.3d 611, 614 (Colo.
 2007) (noting the "basic principle of appellate
 jurisprudence that arguments not advanced on appeal are
 generally deemed waived"); CenCor, Inc. v.
 Tolman,
 
 18
 
 868 P.2d 396, 397 n.l (Colo. 1994) (noting that the propriety
 of the trial court's dismissal of certain claims was not
 briefed on appeal and thus was deemed abandoned). Although
 our case law has used the terms "waiver" and
 "abandonment" somewhat interchangeably,
 "waiver" has been more precisely associated with
 "'the intentional relinquishment of a known
 right or privilege.'" People v.
 Rediger, 2018 CO 32, ¶ 39, 416 P.3d 893, 902
 (emphases added) (quoting Dep't of Health v.
 Donahue, 690 P.2d 243, 247 (Colo. 1984)); cf Babcock
 v. People, 2025 CO 26, ¶ 29, 569 P.3d 850, 856
 (waiver of statutory rights must be "voluntary, but need
 not be knowing and intelligent" (quoting Pinney v.
 People, 2014 CO 38, ¶ 16, 325 P.3d
 1044,1050)).[6] Abandonment, by contrast, "typically
 arises from a party's decision not to pursue or reassert
 a claim that the party had raised previously."
 People v. Smith, 2024 CO 3, ¶¶ 18-19, 541
 P.3d 1191, 1195 (emphasis added) (deeming abandoned certain
 postconviction claims because they were neither briefed nor
 argued during a hearing to the postconviction court).
 
 
          ¶28
 Omissions like waiver and abandonment implicate the broader
 principle of party presentation. See Jeffrey M.
 Anderson, The Principle of Party Presentation, 70
 Buff. L. Rev. 1029, 1037-42, 1045-48, 1075-76 (2022). Under
 that principle, courts "rely on the parties to frame the
 issues for decision." Greenlaw v. United
 
 19
 
 States, 554 U.S 237, 243 (2008) This principle
 recognizes that courts "should not[] sally forth each
 day looking for wrongs to right" Id. at 244
 (quoting United States v Samuels, 808 F.2d 1298,1301
 (8th Cir 1987) (Arnold, J, concurring in the denial of
 rehearing en banc)) Instead, our adversarial system "is
 designed around the premise that the parties know what is
 best for them, and are responsible for advancing the facts
 and arguments entitling them to relief" Id.
 (quoting Castro v United States, 540 U.S. 375, 386 (2003)
 (Scalia, J, concurring in part and concurring in the
 judgment)).
 
 
          ¶29
 Fidelity to the party presentation principle therefore
 generally precludes a court from spontaneously deciding an
 issue that the parties have not raised or had the opportunity
 to address. See Clark v. Sweeney, 607 U.S. 7, 9
 (2025) (reversing the Fourth Circuit because it
 "transgressed the party-presentation principle by
 granting relief on a claim that [the defendant] never
 asserted and that the State never had the chance to
 address"); Galvan v. People, 2020 CO 82,
 ¶¶ 3, 5, 44-46, 476 P.3d 746, 750-51, 757-58
 (concluding that a division of the court of appeals violated
 the party presentation principle when it "sua sponte and
 without briefing" addressed whether interpreting a
 statutory provision a certain way rendered it
 unconstitutionally vague and overbroad).
 
 
          ¶30
 But "[t]he party presentation principle is supple, not
 ironclad." United States v. Sineneng-Smith, 590
 U.S. 371, 376 (2020); cf. People in Int. of B.H.,
 2021 CO
 
 20
 
 39, ¶ 29 n.3, 488 P.3d 1026, 1034 n.3 (explaining that
 while the parties' briefs did not explicitly address a
 particular statute, one party raised the statute at oral
 argument; quoting Sineneng-Smith and concluding that
 our discussion of the statute did not "run afoul of the
 party-presentation principle given the scope of the issues
 that the parties [had] placed before us").
 
 
          ¶31
 Importantly, the party presentation principle does not
 constrain a court's fundamental obligation to ascertain
 controlling law. Dan Ryan Builders, Inc., 783 F.3d
 at 980. "A party's failure to identify the
 applicable legal rule certainly does not diminish a
 court's responsibility to apply that rule."
 Id. In other words, "[w]hen an issue or claim
 is properly before the court, the court is not limited to the
 particular legal theories advanced by the parties, but rather
 retains the independent power to identify and apply the
 proper construction of governing law." Kamen v.
 Kemper Fin. Servs., Inc., 500 U.S. 90, 94-95, 98-100,
 108-09 (1991) (concluding that while the petitioner did not
 raise an argument about the applicable state corporate law
 until her reply brief to the Seventh Circuit, the Seventh
 Circuit erred by disregarding that state law because it was
 required to identify "the proper source of
 federal common law in this area"); see also
 Masterpiece Cakeshop, Inc. v. Scardina, 2024 CO 67,
 ¶ 49, 556 P.3d 1238, 1250 ("[W]e have an obligation
 to interpret and apply the law.").
 
 21
 
          ¶32
 Relevant here, the Supreme Court has expressly recognized
 that courts have the discretion to consider an issue that is
 "'antecedent to . . . and ultimately dispositive
 of' the dispute before it, even an issue the parties fail
 to identify and brief." U.S. Nat'l Bank of Or.
 v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 444-48
 (1993) (omission in original) (quoting Arcadia v. Ohio
 Power Co., 498 U.S. 73, 77 (1990)) (concluding that
 although respondents argued that a ruling was inconsistent
 with a particular federal statute that the parties had
 assumed was valid, the District of Columbia Circuit was
 within its discretion to first consider whether that statute
 was still in force); see also Lebron v. Nat'l R.R.
 Passenger Corp., 513 U.S. 374, 378-82 (1995) (concluding
 that the Court had the authority to consider an argument the
 petitioner had expressly disavowed in the courts below,
 citing United States National Bank of Oregon, and
 explaining that "[w]hen a question is, like this one,
 both prior to the clearly presented question and dependent
 upon many of the same factual inquiries, refusing to regard
 it as embraced within the petition may force us to assume
 what the facts will show to be ridiculous, a risk that ought
 to be avoided"); United States v. Burke, 504
 U.S. 229, 246 (1992) (Scalia, J., concurring in the judgment)
 (" [T]here must be enough play in the joints that the
 Supreme Court need not render judgment on the basis of a rule
 of law whose nonexistence is apparent on the face of things,
 simply because the parties agree upon it. . . .").
 
 22
 
          ¶33
 The Supreme Court's reasoning applies here. In addressing
 whether the trial court erred in suppressing Lulei's
 statements under Edwards, we are not obligated to
 ignore the district court's erroneous legal premise that
 a Miranda advisement outside of a custodial
 interrogation triggers protections under Miranda and
 Edwards, simply because the People failed in their
 initial briefing to flag this particular basis for
 challenging the court's Edwards analysis.
 Likewise, the party presentation principle is not so rigid
 that it must force us to ignore the district court's
 factual finding (or defense counsel's concession) that
 Lulei was not in custody when he invoked the right to counsel
 - a critical finding that underpinned the district
 court's ruling. Rather, under the circumstances of this
 case, we may exercise our discretion to consider the custody
 issue as a necessary antecedent to the Edwards
 dispute before us because it is inherent to our review of the
 district court's ruling.
 
 
          ¶34
 Our decision in Kutlak is illustrative of this
 point. There, we chose to consider an issue that was a
 necessary antecedent to the Edwards dispute before
 us, even though it had not been raised by the parties. In
 that case, a division of the court of appeals held that the
 police violated Edwards because they never stopped
 the interrogation after the defendant made a reference to his
 attorney. Kutlak, ¶ 7, 364 P.3d at 202. On
 review, we observed that an Edwards analysis
 embodies two distinct inquiries: first, whether the
 individual subjected to custodial interrogation
 
 23
 
 actually invoked their right to counsel, and second, whether
 they initiated further discussions with the police and
 knowingly and intelligently waived the right they previously
 invoked. Id. at ¶ 9, 364 P.3d at 202. Although
 it was undisputed that Kutlak was subjected to custodial
 interrogation, we were still required to ensure that
 "the suspect actually invoked his right to
 counsel." Id. at ¶¶ 9,11, 364 P.3d at
 202-03. The People had taken inconsistent positions on this
 point in the lower courts, and they had not initially briefed
 the issue for our review. Id. at ¶ 10, 364 P.3d
 at 202-03. Following oral argument to this court, we sua
 sponte ordered supplemental briefing on the issue of whether
 Kutlak had unambiguously invoked his right to counsel.
 Id. at ¶ 11, 364 P.3d at 203. We then
 ultimately resolved the case "on the threshold inquiry
 of the Edwards analysis," concluding that the
 defendant did not actually invoke his right to counsel.
 Id. at ¶ 12, 364 P.3d at 203. In sum, even
 though the People failed to initially brief the issue of
 invocation of counsel, we chose to address it as
 "antecedent to . . . and ultimately dispositive of"
 the Edwards issue directly before us. U.S.
 Nat'l Bank of Or., 508 U.S. at 447 (omission in
 original) (quoting Arcadia, 498 U.S. at 77).
 
 
          ¶35
 Our decision in Kutlak applies with equal force
 here. In this case, the People seek review under C. A.R. 4.1,
 asking us to determine whether the trial court erred in
 suppressing Lulei's statements under Edwards. To
 properly resolve that issue, we must first consider whether
 Lulei was in custody when he invoked his right to
 
 24
 
 counsel.[7] If Lulei was not in custody, then the rule
 in Edwards is inapplicable. See
 Montejo, 556 U.S. at 795 ("If the defendant is
 not in custody then [Miranda and Edwards]
 do not apply."). If Edwards is inapplicable,
 then we need not consider whether law enforcement violated
 Edwards by reinitiating the interrogation. See
 Kutlak, ¶ 12, 364 P.3d at 203.
 
 
          ¶36
 Accordingly, guided by Kutlak, we proceed to
 consider whether Lulei was in custody when he asserted the
 right to counsel because custody is a necessary antecedent to
 the Edwards analysis presented on appeal.
 
 
          B.
 Miranda and Edwards
 
 
          ¶37
 The Fifth Amendment to the United States Constitution
 provides that no person "shall be compelled in any
 criminal case to be a witness against
 himself."[8]U.S. Const, amend. V. To protect this
 privilege against self-incrimination, Miranda
 requires law enforcement to employ procedural safeguards
 before subjecting an individual to custodial interrogation.
 Miranda, 384 U.S. at 478-79. Among other
 
 25
 
 things, law enforcement must notify the individual of their
 right to remain silent and to have an attorney present during
 custodial interrogation. Id.; see also Edwards, 451
 U.S. at 482 (Miranda thus declared that an accused
 has a Fifth. . . Amendment right to have counsel present
 during custodial interrogation.").
 
 
          ¶38
 Miranda's prophylactic rule serves to
 "dissipate the compulsion inherent in custodial
 interrogation and, in so doing, guard against abridgment of
 the suspect's Fifth Amendment rights." Moran v.
 Burbine, 475 U.S. 412, 425 (1986). Critically,
 "this extraordinary safeguard 'does not apply
 outside the context of the inherently coercive custodial
 interrogations for which it was designed.'"
 People v. Coke, 2020 CO 28, ¶ 14, 461 P.3d 508,
 513 (quoting Minnesota v. Murphy, 465 U.S. 420, 430
 (1984)).
 
 
          ¶39
 In Edwards, the Court clarified
 Miranda's Fifth Amendment protections, holding
 that when an individual is subject to custodial interrogation
 and unambiguously invokes their right to counsel, law
 enforcement may not continue the interrogation until counsel
 has been made available, unless the individual reinitiates
 communication with the police. Edwards, 451 U.S. at
 484-85. In other words, "it is inconsistent with
 Miranda and its progeny for the authorities, at
 their instance, to reinterrogate an accused in custody if he
 has clearly asserted his right to counsel." Id.
 at 485.
 
 26
 
          ¶40
 Because an individual's rights under Miranda -
 and, by extension, Edwards-attach only in the
 inherently coercive setting of custodial interrogation,
 "[i]f the defendant is not in custody then those
 decisions do not apply." Montejo, 556 U.S. at
 795; see also Coke, ¶ 7, 461 P.3d at 512
 (concluding that because the defendant was not in custody,
 she was not entitled to Miranda protections).
 
 
          ¶41
 Importantly, a Miranda advisement does not itself
 create Miranda rights. "[The] Court has
 'never held that a person can invoke his Miranda
 rights anticipatorily, in a context other than
 "custodial interrogation."'" Bobby v.
 Dixon, 565 U.S. 23, 28 (2011) (quoting McNeil v.
 Wisconsin, 501 U.S. 171, 182 n.3 (1991)). Similarly,
 while Edwards provides that the Miranda
 right to counsel, once invoked, is effective regarding future
 custodial interrogation, this does not mean that an
 individual may initially assert a Fifth Amendment right to
 counsel outside the context of custodial interrogation, with
 similar future effect. McNeil, 501 U.S. at 182 n.3.
 
 
          ¶42
 Consistent with these principles, several states have
 recognized that a defendant may not invoke a Fifth Amendment
 right to counsel outside of custodial interrogation. See,
 e.g., State v. Bartelt, 906 N.W.2d 684, 700 (Wis. 2018)
 ("Because [the defendant] was not in custody when he
 asked about counsel, his Fifth Amendment right to counsel did
 not attach."); Commonwealth v. Eibby, 32 N.E.3d
 890, 900 (Mass. 2015) ("Given our conclusion that the
 defendant was not in
 
 27
 
 custody ... his interview on this date was simply not
 governed by Miranda. Therefore ... he did not
 effectively invoke a 'right' to counsel."
 (citation omitted)); State v. Pontbriand, 878 A.2d
 227, 234 (Vt. 2005) ("[The defendant] was not in police
 custody during the interview .. . [a]ccordingly,
 Miranda is inapplicable here, and the police were
 not obliged to stop questioning [him] when he indicated he
 wished to speak with a lawyer."); Hannon v.
 State, 84 P.3d 320, 337 (Wyo. 2004) ("[T]his
 [c]ourt adheres to the principle that the rights recognized
 in Miranda, including the right to counsel, apply
 only in the context of custodial interrogation.").
 
 
          ¶43
 Moreover, administering a Miranda advisement does
 not create an inherently coercive environment when the
 individual is otherwise not in custody. Cf. Oregon v.
 Mathiason, 429 U.S. 492, 494-95 (1977) (holding that the
 defendant was not in custody even after the police advised
 the defendant of his Miranda rights and the
 defendant gave a taped confession). Indeed, other
 jurisdictions have expressly concluded that a
 Miranda advisement does not, by itself, trigger a
 suspect's Fifth Amendment right to counsel outside of
 custodial interrogation. See, e.g., Commonwealth v.
 Morgan, 610 A.2d 1013, 1016, 1018 (Pa. Super. Ct. 1992)
 (noting that "the police officer took the precautionary
 step of reading Miranda rights to a
 non-custodial suspect, before they were
 exercised" and concluding that "it is error for a
 court to consider a confession presumptively coerced merely
 because a request for a lawyer is not honored where, as here,
 the suspect was not
 
 28
 
 in custody at the time"); State v. Stanley, 809
 P.2d 944, 948 (Ariz. 1991) (concluding that "there was
 neither a Miranda nor an Edwards violation
 because [the defendant] was not in custody at the time of
 [the officer's] questioning" regardless of the fact
 that police gave the defendant Miranda warnings).
 
 
          ¶44
 Here, although the district court twice concluded that Lulei
 was not in custody, it nevertheless ruled (consistent with
 defense counsel's contention at the suppression hearing)
 that Lulei's invocation of his right to counsel was
 effective because Detective Bolton attempted to give him a
 Miranda advisement. This ruling was erroneous as a
 matter of law. As discussed above, Miranda applies
 only in the context of custodial interrogation. The Fifth
 Amendment right to counsel is not triggered merely because
 the police attempted to give a Miranda advisement
 because a Miranda advisement, without more, does not
 create the context of custodial interrogation. See
 McNeil, 501 U.S. at 182 n.3.
 
 
          C.
 The Record Confirms that Lulei Was Not in Custody When He
 Invoked the Right to Counsel
 
 
          ¶45
 Our conclusion above does not end our inquiry. Rather, to
 determine whether the district court erred in suppressing
 Lulei's statements under Edwards, we must
 examine whether, under the totality of the circumstances,
 Lulei was in custody when he invoked the right to counsel.
 Our independent review of the audio- and video-recorded
 interrogation confirms the trial court's determination
 that he was not.
 
 29
 
          ¶46
 A person is in custody for purposes of Miranda if,
 under the totality of the circumstances, "a reasonable
 person in the suspect's position would have felt that
 [their] freedom of action had been curtailed to a degree
 associated with formal arrest." People v.
 Eugene, 2024 CO 59, ¶ 15, 555 P.3d 601, 605
 (quoting People v. Garcia, 2017 CO 106, ¶
 20,409 P.3d 312,317); see also Stansbury v.
 California, 511 U.S. 318, 322 (1994).
 
 
          ¶47
 We consider a nonexhaustive list of factors to determine
 whether, from an objective perspective, an individual was
 subjected to circumstances associated with formal arrest:
 
 
 (1) the time, place, and purpose of the encounter;
 
 
 (2) the persons present during the interrogation;
 
 
 (3) the words spoken by the officer to the defendant;
 
 
 (4) the officer's tone of voice and general demeanor;
 
 
 (5) the length and mood of the interrogation;
 
 
 (6) whether any limitation of movement or other form of
 restraint was placed on the defendant during the
 interrogation;
 
 
 (7) the officer's response to any questions asked by the
 defendant;
 
 
 (8) whether directions were given to the defendant during the
 interrogation; and
 
 
 (9) the defendant's verbal or nonverbal response to such
 directions.
 
 
 People v. Matheny, 46 P.3d 453,465-66 (Colo. 2002).
 
 30
 
          ¶48
 "A court may consider many factors, but no single factor
 is determinative, and a court is not limited in the number of
 factors it may consider." Eugene, ¶ 15,
 555 P.3d at 605 (quoting People v. Minjarez, 81 P.3d
 348, 353 (Colo. 2003)). It is irrelevant whether the
 individual is "actually arrested at the close of the
 interview." People v. Willoughby, 2023 CO 10,
 ¶ 21, 524 P.3d 1186, 1192 (quoting Matheny, 46
 P.3d at 468 n.lO).
 
 
          ¶49
 Applying these factors here, our review of the record
 confirms that Lulei was not in custody when he invoked his
 right to counsel.
 
 
          ¶50
 We begin by noting that the time and purpose of the encounter
 weigh against custody. The encounter took place in the early
 afternoon. See id. at ¶ 23, 524 P.3d at 1192
 (noting that an encounter that takes place in daytime weighs
 against custody). Detective Bolton told Lulei that he had
 "a couple follow-up questions" regarding the
 roommate's death, indicating that the purpose of the
 encounter was for Lulei to provide more information as a
 voluntary witness, not a suspect. Cf. People v.
 Holt, 233 P.3d 1194,1198 (Colo. 2010) (noting that the
 police behaved as though the defendant was a prime suspect in
 a serious felony investigation, a fact that was "an
 important consideration in our custody determination").
 
 
          ¶51
 Lulei went to the station voluntarily - nothing in the record
 indicates he was taken against his will. Compare
 Mathiason, 429 U.S. at 495 (concluding that the fact
 
 31
 
 that the defendant went to the police station voluntarily and
 was told he was not under arrest weighed against custody),
 with People v. Sandoval, 218 P.3d 307,309-10 (Colo.
 2009) (concluding that the defendant was in custody in part
 because the officer informed the defendant that if he would
 not come to the station voluntarily, he would be forced to go
 against his will). Although Lulei was handcuffed in front of
 his body during transport to DPD headquarters, this was
 standard procedure for officer safety.
 
 
          ¶52
 The encounter took place in a windowless interview room at
 the station, but the door was unlocked and Lulei was not in
 handcuffs or restrained in any way. See People v.
 Clark, 2020 CO 36, ¶ 33, 500 P.3d 356, 362 (noting
 that the absence of handcuffs during the interrogation
 weighed against custody); Mathiason, 429 U.S. at 495
 (holding that the defendant was not in custody despite being
 questioned at the police station because "there is no
 indication that the questioning took place in a context where
 [the suspect's] freedom to depart was restricted in any
 way"). Instead, he was free to get up, and he even
 opened the interview room door on multiple occasions. See
 People v. Davis, 2019 CO 84, ¶ 31, 449 P.3d 732,
 740 ("Another 'well-recognized circumstance tending
 to show custody is the degree of physical restraint used by
 police officers to detain' a person." (quoting
 People v. Breidenbach, 875 P.2d 879, 886 (Colo.
 1994))). Although Detective Bolton was carrying a bolstered
 firearm, he was dressed in plain clothes and sat farthest
 from
 
 32
 
 the unlocked door. See People v. Becker, 196 P.3d
 264, 267 (Colo. 2008) (considering the facts that the
 officer's weapon was concealed during the interrogation
 and the officer made an effort with his physical presence to
 avoid the appearance that the defendant was not free to leave
 in concluding that the defendant was not in custody).
 
 
          ¶53
 Detective Bolton's tone was calm, nonconfrontational,
 casual, and generally deferential to Lulei, even when Lulei
 expressed his frustration that he was made to wait. See
 Davis, ¶ 33,449 P.3d at 741 ("We have also
 considered an officer's tone of questioning particularly
 relevant to a custody determination."); People v.
 Padilla, 2021 CO 18, ¶ 24, 482 P.3d 441, 447
 (considering the nonconfrontational, friendly demeanor of the
 officer and the casual mood of the conversation as facts
 weighing against custody).
 
 
          ¶54
 The encounter was relatively brief; Lulei set a timer on his
 phone for six minutes, telling Detective Bolton that he was
 "wasting time." See Padilla, ¶ 25,
 482 P.3d at 448 ("[W]e place particular emphasis on the
 fact that [the defendant] dictated the length of the
 interrogation .. . because a reasonable person who sets the
 length of an interrogation is unlikely to believe that his
 freedom of action has been curtailed to a degree associated
 with formal arrest.").
 
 
          ¶55
 Furthermore, Detective Bolton made no threats, commands, or
 any show of force. See People v. Bohler, 2024 CO 18,
 ¶ 30, 545 P.3d 509, 516 (noting that the
 
 33
 
 officers "made no threats, they made no promises, and no
 one referenced criminal liability" when concluding that
 the defendant was not in custody (footnote omitted)). When
 Lulei indicated that he was leaving at the very beginning of
 the interview, Detective Bolton directed Lulei to wait.
 However, this directive was not accompanied by "force,
 threats of negative consequences for not complying, or an
 aggressive tone." Id. at ¶ 33, 545 P.3d at
 517.
 
 
          ¶56
 Additionally, Detective Bolton had not told Lulei that he was
 under arrest at any point before Lulei invoked the right to
 counsel. See Willoughby, ¶ 28, 524 P.3d at 1192
 ("Courts place great weight on whether police tell a
 suspect that they are under arrest."). Instead,
 Detective Bolton repeatedly reassured Lulei that he would
 help Lulei leave and that he just wanted a little bit of
 Lulei's time. Cf. Matheny, 46 P.3d at 467
 (concluding that the fact that the officer told the defendant
 he was free to go at any time weighed against custody).
 Finally, although Detective Bolton attempted to administer a
 Miranda advisement, this alone did not transform the
 situation into a custodial setting. See United States v.
 Bautista, 145 F.3d 1140, 1148 (10th Cir. 1998)
 (acknowledging that "the reading of the Miranda
 warning to a suspect does not create a custodial
 interrogation").
 
 
          ¶57
 In sum, our review of the record confirms that, under the
 totality of the circumstances, a reasonable person in
 Lulei's position would not have felt that his freedom of
 movement was curtailed to a degree associated with formal
 arrest.
 
 34
 
          ¶58
 Because Lulei was not in custody when he invoked his right to
 counsel, Miranda and Edwards are
 inapplicable here. Montejo, 556 U.S. at 795. Put
 differently, because Lulei's Fifth Amendment right to
 counsel under Miranda had not attached, the district
 court erred in suppressing Lulei's statements under
 Edwards on grounds that law enforcement failed to
 scrupulously honor Lulei's request for an attorney by
 reinitiating the interrogation.
 
 
          D.
 Voluntariness
 
 
          ¶59
 Finally, we decline to consider Lulei's supplemental
 briefing arguments related to the voluntariness of his
 Miranda waiver and his post-Miranda
 statements because "interlocutory relief under C.A.R.
 4.1 is not available to defendants." People v.
 Brown, 2022 CO 11, ¶ 13, 504 P.3d 970, 974-75. The
 district court concluded that Lulei's statements were
 voluntary and there was no police coercion. "[I] f the
 district court resolves a suppression issue against the
 defendant, we have no jurisdiction to address it in an
 interlocutory appeal." People v. Weston, 869
 P.2d 1293,1297 (Colo. 1994).
 
 
          IV.
 Conclusion
 
 
          ¶60
 This unusual case is illustrative of why the party
 presentation principle "is a 'supple' rule, not
 an intransigent one." Galvan, ¶ 46, 476
 P.3d at 758 (quoting Sineneng-Smith, 590 U.S. at
 376). Here, we have a finding by the trial court, based in
 part on a concession by defense counsel, that Lulei was not
 in custody. The
 
 35
 
 record supports that finding. Rigid adherence to the party
 presentation principle would require us to disregard that
 finding, not to mention the trial court's undisputable
 legal error premised on that finding. In all, it would force
 a resolution of the Edwards issue before us that is
 untethered to the facts or the law. But the principle is not
 ironclad, and we are not shackled to such an outcome.
 Instead, under the circumstances here, we follow our decision
 in Kutlak and exercise our discretion to address the
 issue of custody as a necessary antecedent to the
 Edwards issue before us. We perceive no unfairness
 in doing so here, particularly given that the issue of
 custody was expressly addressed (and conceded by the defense)
 below, it was discussed at oral argument, and the parties
 filed supplemental briefing on the issue in this court.
 
 
          ¶61
 In sum, we reverse the district court's order suppressing
 Lulei's statements on the basis that law enforcement
 violated Lulei's Miranda rights under
 Edwards, and we remand the case for further
 proceedings.
 
 
          
 JUSTICE BLANCO concurred in part and concurred in the
 judgment.
 
 
          
 JUSTICE GABRIEL, joined by JUSTICE HOOD and JUSTICE
 BERKENKOTTER, dissented.
 
 36
 
          
 JUSTICE BLANCO, concurring in part and concurring in the
 judgment.
 
 
          ¶62
 I write separately to address an apparent injustice: Today
 the People prevail on an argument they failed to advance.
 Specifically, this court rules in favor of the People because
 Dakotah J. Lulei "was not in custody [under
 Miranda] when he invoked his right to counsel,"
 Pl. op. ¶ 49, even though the People failed to brief
 that issue prior to oral argument before this court.
 
 
          ¶63
 But that is not the whole picture, and the party presentation
 principle remains vital. Although Lulei indicates the People
 unfairly ambushed him at oral argument, the parties also
 presented the Miranda custody issue in two other
 ways: the People's C.A.R. 4.1 Notice of Interlocutory
 Appeal (the "Notice") and the supplemental briefing
 requested by Lulei. These presentations from the
 parties collectively (if barely) placed the custody issue
 before this court despite the People's failure to do so
 in their pre-argument briefing.
 
 
          ¶64
 Therefore, I agree with the plurality's conclusions
 regarding party presentation. I depart from its reasoning,
 however, because I do not rely on a "fundamental
 obligation to ascertain controlling law." Pl. op. at
 ¶ 31. Consequently, I respectfully agree with the
 plurality that we may address the custody issue, concur in
 part with its reasoning, and join this court's judgment.
 
 37
 
          I.
 Discussion
 
 
          ¶65
 This court is unanimous in finding that the People failed to
 address the Miranda custody issue in their Opening
 Brief or in their Reply Brief. Pl. op. ¶¶ 15-16;
 Diss. op. ¶¶ 88, 90. The People did present the
 issue, however, by way of (1) the Notice, (2) oral argument,
 and (3) supplemental briefing.
 
 
          ¶66
 First, the Notice framed the "Issues to be Raised on
 Appeal" as "Did the district court err in
 suppressing [Lulei's] statements?" Although it is
 preferable for issues to be framed with greater specificity,
 the People limited the Notice's citations to two cases:
 Miranda v. Arizona, 384 U.S. 436 (1966), and
 Edwards v. Arizona, 451 U.S. 477 (1981). Both cases
 recognize custody as a prerequisite to their holdings.
 See Miranda, 384 U.S. at 478 ("To summarize, we
 hold that when an individual is taken into custody . . . and
 is subjected to questioning, the privilege against
 self-incrimination is jeopardized."); Edwards,
 451 U.S. at 485-86 ("The Fifth Amendment right
 identified in Miranda is the right to have counsel
 present at any custodial interrogation. Absent such
 interrogation,. . . there would be no occasion to determine
 whether there had been a valid waiver."). Thus, the
 issue of custody was fairly encompassed by the Notice. The
 Notice, however, is insufficient to end my inquiry.
 
 
          ¶67
 Second, during oral argument, the People addressed the
 custody issue by arguing, "[L]et's take a step back
 .... At the time that Mr. Lulei invoked [his right
 
 38
 
 to counsel,] he actually wasn't in custody .... That is
 what the trial court found." Indeed, the district court
 found that "everyone has confessed [Lulei] was not in
 custody [when he was brought to the police station,]"
 and Lulei did not contest this finding in his pre-oral
 argument Answer Brief. Even then, the Notice and the oral
 argument were insufficient to present the custody issue.
 
 
          ¶68
 Finally, Lulei requested supplemental briefing after oral
 argument. This court then ordered briefing for, among other
 issues, "Whether Mr. Lulei was, in fact, in custody at
 the time he invoked his right to counsel. . . ." Thus,
 both Lulei and the People presented the Miranda
 custody issue to this court.
 
 
          ¶69
 Importantly, this court did not address the custody issue on
 its own initiative. We do not permit courts below to reach an
 issue "sua sponte and without briefing" when
 "neither party raise[d] it," Galvan v.
 People, 2020 CO 82, ¶¶ 44-47, 476 P.3d 757-58,
 so I apply the same principle here. I find it significant
 that Lulei -rather than this court -requested supplemental
 briefing on the custody issue. But see People v.
 Kutlak, 2016 CO 1, ¶¶ 10-12, 364 P.3d 199,
 202-03 (ruling in favor of the People after sua sponte
 requesting supplemental briefing on an issue the People
 raised in response to this court's questions during oral
 argument even when the People did not present the issue in
 pre-argument briefs). In my opinion, which follows the more
 recent Galvan to the extent that case conflicts with
 Kutlak, it took the sum of the Notice, oral
 argument, and
 
 39
 
 supplemental briefing to present this issue despite the
 People's failure to do so in their pre-argument briefing.
 
 
          ¶70
 I also acknowledge this court facilitated the parties'
 presentations of the custody issue by ordering oral argument
 and supplemental briefing.[1] But those orders followed the Notice
 and Lulei's unopposed request for supplemental briefing,
 respectively, and there is no question this court had
 discretion to issue the orders. See C.A.R. 4.1(g)
 ("Oral argument is not permitted unless ordered by the
 court."). Now, the oral argument cannot be unheard; the
 supplemental briefing cannot be unfiled. Nor did either party
 ask this court to reconsider the orders. Therefore, I take
 this case as I find it, after the district court addressed
 the custody issue, which was then presented to this court
 through the sum of the Notice, oral argument, and
 supplemental briefing.
 
 
          A.
 Agreement with the Plurality/Majority
 
 
          ¶71
 Under these circumstances, I agree with the plurality's
 conclusions regarding party presentation, waiver, and
 abandonment. Having determined the custody issue was
 permissibly reached, I join this court's reasoning and
 conclusion that Lulei was not in custody when he requested an
 attorney. Pl. op. ¶¶ 37-58. I
 
 40
 
 also join this court's decision to reverse the
 suppression order and to remand this case to the district
 court for further proceedings.
 
 
          B.
 Disagreement with the Plurality
 
 
          ¶72
 I do not agree with three aspects of the plurality's
 opinion. First, I do not join its discussion of courts'
 "fundamental obligation to ascertain controlling
 law." Id. at ¶¶ 31-36. I cannot
 square this proposed obligation with parties'
 responsibility to advance "the facts and argument
 entitling them to relief." See Galvan, ¶
 45, 476 P.3d at 757 (quoting United States v.
 Sineneng-Smith, 590 U.S. 371, 375-76 (2020)). Although
 the plurality's opinion may be interpreted to avoid this
 conflict, courts should not place the cart (deciding legal
 questions) before the horse (confining decisions to contested
 issues). In my view, courts must first assure themselves that
 litigants have presented a disputed issue before considering
 the merits of the issue. A "fundamental obligation to
 ascertain controlling law" runs the risk of conflating
 issue presentation with merits determinations.
 
 
          ¶73
 Even in Masterpiece Cakeshop, Inc. v. Scardina, 2024
 CO 67, ¶ 21, 556 P.3d 1238, 1245, which the plurality
 cites, this court ruled on an issue preserved and presented
 by the petitioner: whether a particular statute barred the
 district court from hearing a claim. Only after we determined
 the issue was "squarely before us" did we interpret
 the statute. Id. Although we interpreted the statute
 differently than the parties, that was beside the point of
 whether the parties
 
 41
 
 presented the issue. See id.; see also Lucero v.
 People, 2017 CO 49, ¶ 26,394 P.3d 1128, 1134
 ("[C]ourts 'rely on the parties to frame the issues
 for decision' .... This principle, however, does not
 prevent a court from properly characterizing an issue that
 has been improperly characterized by a party." (quoting
 Greenlaw v. United States, 554 U.S. 237, 243
 (2008))). Thus, this court's legal determination properly
 followed the parties' issue presentation.
 
 
          ¶74
 Accordingly, in assessing whether the custody issue is before
 this court, I considered the parties' presentations. I
 did not consider the issue's merits, nor did I follow a
 fundamental obligation to ascertain controlling law.
 
 
          ¶75
 Second, I would specify that this court does not hold against
 Lulei the custody-related statements his counsel made during
 oral argument. See Diss. op. ¶ 100. But
 see Pl. op. ¶¶ 16 &16 n.4, 60. In my view,
 litigants generally should not raise unbriefed issues during
 oral argument and adverse parties should not be penalized for
 good-faith responses to such arguments. I would seek to avoid
 any chilling effect on responses to objectively unexpected
 questions during oral argument.
 
 
          ¶76
 Third, although I agree with the plurality's conclusions,
 I would be remiss to overlook the wisdom of the dissent and
 the value we must place on adhering to the party presentation
 principle. We rely on these procedures to provide a fair
 opportunity for preparation and to keep the judiciary in its
 adjudicatory lane.
 
 42
 
          There
 is a dire cost to everyone when courts deviate from these
 principles, which are only worthwhile if they are actively
 maintained. I differ from the dissent, however, because the
 parties in this matter did eventually present the custody
 issue to this court.
 
 
          II.
 Conclusion
 
 
          ¶77
 Accordingly, I respectfully concur in part and concur in the
 judgment.
 
 43
 
          
 JUSTICE GABRIEL, joined by JUSTICE HOOD and JUSTICE
 BERKENKOTTER, dissenting.
 
 
          ¶78
 Today, a majority of this court reverses the district
 court's suppression order on the ground that Miranda
 v. Arizona, 384 U.S. 436, 444-45 (1966), and Edwards
 v. Arizona, 451 U.S. 477 (1981), do not apply because
 Dakotah J. Lulei was not in custody during the interrogation
 at issue. Pl. op. ¶¶ 2, 23, 37-58; Cone. op. ¶
 71. In so ruling, the plurality adopts (and
 substantially develops over many pages) an argument
 that the People made for the first time in oral argument
 (during which the People relied on case law not cited in any
 of their briefs). And the plurality does so notwithstanding
 the fact that the People's new argument was completely
 inconsistent with the argument presented in their briefing
 before this court.
 
 
          ¶79
 The plurality's analysis largely sidesteps long-settled
 principles of waiver and abandonment, and it substantially
 erodes the party presentation principle. After today, it
 would appear that any party may present at oral argument
 positions not argued in their briefs and this court may
 address those new assertions if they have some relationship
 to the issue actually raised and a majority of this court
 believes that addressing the new contentions will allow the
 majority to reach what it has determined to be the correct
 result.
 
 
          ¶80
 I cannot subscribe to such a precedent, which undermines the
 orderly appellate process long prescribed by our rules and
 case law. Contrary to the plurality, I believe that, by
 arguing in their briefs only that the trial court
 
 44
 
 erroneously suppressed Lulei's statements because the
 police did not reinitiate questioning (an argument that
 presumed Lulei's custody and Edwards's
 applicability in this case), the People waived or abandoned
 any contention that Lulei was not in custody and that
 Edwards did not apply. I would thus address only the
 issue that the People actually raised in this case, and I
 would conclude that after Lulei clearly and unambiguously
 invoked his right to counsel, the police did not scrupulously
 honor that invocation.
 
 
          ¶81
 Accordingly, I would affirm the trial court's suppression
 order, and therefore, I respectfully dissent.
 
 
          I.
 Factual and Procedural Background
 
 
          ¶82
 After Lulei and another man spent time together in a motel
 room drinking and smoking pot, Lulei called 911 to report a
 medical emergency. Medical personnel and the police
 responded, but the other man (the "victim") was
 pronounced dead at the scene. An autopsy revealed that the
 victim had suffered severe internal trauma. The police thus
 commenced an investigation.
 
 
          ¶83
 Lulei later agreed to come to police headquarters to give a
 statement, and the police transported him there in a police
 vehicle. Pursuant to department policy, Lulei was handcuffed
 (with his hands in front of him) while being transported.
 
 45
 
          ¶84
 Lulei was eventually brought to an interview room for
 questioning by Detective Bolton. Lulei told the detective
 that the police already had his statement, but the detective
 responded that he had a couple of follow-up questions. The
 detective then began going through a Miranda
 advisement form with Lulei. The detective provided the form
 to Lulei, who began reading it to himself. After reading the
 form for a brief time, Lulei asked, "Oh, so I'm
 allowed to have a lawyer present for this?" The
 detective responded, "Absolutely," at which point
 Lulei replied, "Oh, hell yeah, let's reschedule this
 when I have a lawyer present." The detective then said,
 "Okay, we can do that."
 
 
          ¶85
 Lulei stood and opened the interview door to leave, but the
 detective told him to wait until he could talk to his
 colleagues. The detective left the room and conferred with
 another detective (Detective Sandoval) and a deputy district
 attorney, and the three of them decided to arrest Lulei.
 Detective Bolton then reentered the room with Detective
 Sandoval and a uniformed officer, and the officer asked Lulei
 to turn around. The following conversation ensued:
 
 
 Lulei: What?
 
 
 Officer: I'm just gonna put the cuffs on you; we did this
 before.
 
 
 Lulei: But you all put it on in front of me on the way here.
 
 
 Det. Sandoval: We did, yes. Not now.
 
 
 Lulei: What's going on now?
 
 46
 
 Det. Bolton: Well, Dakotah, I tried to talk to you, get
 your side of the story. Right now, you're going
 to be arrested, okay?
 
 
 Lulei: What the fuck? For what?
 
 
 Det. Sandoval: For murder.
 
 
 Lulei: Oh, dude, no. Like, let's talk this out then.
 Dude, like, no.
 
 
 Det. Sandoval: Nope, you had your chance, and you asked
 for a lawyer. We can't do it now.
 
 
 Det. Bolton: I tried to talk to you smoothly, man, and
 hear your side of it. We have some serious questions.
 
 
 Lulei: Alright, I'll rescind that then. I have serious -
 like, get answers then, dude. Like come on, like, don't
 fucking arrest me right now. I have my fucking motel paid
 for, for the next two weeks. I have to go to work on Monday.
 Like, I'm down to talk to you. Like, dude, like don't
 fucking detain me and shit like that. I thought I was going
 to be free to go after this.
 
 
 Det. Sandoval: Well, no one told you you were free to go
 after this -
 
 
 Det. Bolton: No one told you that, and also, I tried to
 get your side of the story and figure it out, man, and you
 didn't want to talk.
 
 
 Lulei: I'll talk to you now, man.
 
 
 Det. Bolton: Gimme a second.
 
 
 (Emphases added.)
 
 47
 
          ¶86
 Detective Bolton subsequently re-Mirandized Lulei
 and proceeded to question him for over two hours. In the
 course of this conversation, Lulei made incriminating
 statements.
 
 
          ¶87
 The People charged Lulei with one count of second degree
 murder and one count of first degree assault. Lulei
 thereafter filed a motion to suppress his statements to the
 detective, and the trial court conducted a hearing on this
 motion. At the conclusion of the hearing, the trial court
 granted the motion. As pertinent here, the court found that
 "defendant's request for [an] attorney was not
 scrupulously honored" when Lulei asked what was going on
 and the detective responded, "I tried to talk to you to
 get your side of the story. Right now, you're going to be
 arrested, okay?"
 
 
          ¶88
 The People then filed an interlocutory appeal in this court.
 Notably, at no time did the People contend that Lulei was not
 in custody and therefore Edwards did not apply. To
 the contrary, throughout their briefing, the People proceeded
 on the premise that Edwards applied. They thus
 argued that the trial court had erred in suppressing the
 statements that Lulei had made to Detective Bolton because,
 in the People's view, the police did not reinitiate any
 questioning. Instead, the People maintained that they had
 scrupulously honored Lulei's unambiguous invocation of
 his right to counsel and they did nothing other than answer
 Lulei's questions about what was happening.
 
 48
 
          ¶89
 Lulei filed an answer brief, responding that Detective
 Bolton's comments referencing Lulei's invocation of
 his right to counsel was reasonably perceived by Lulei as
 punishment for invoking that right. Thus, in Lulei's
 view, the detective had improperly induced Lulei to
 reconsider his invocation of the right to counsel to avoid
 the perceived punishment. Finally, Lulei argued that he did
 nothing to reinitiate the interrogation.
 
 
          ¶90
 The People then filed a reply, arguing that Detective Bolton
 had scrupulously honored Lulei's invocation of the right
 to counsel and that Lulei had decided to reinitiate the
 interrogation.
 
 
          ¶91
 In short, all of the briefing in this case presumed
 that Lulei was in custody and proceeded on the premise that
 Edwards applies here. The parties disagreed only as
 to the result of the Edwards analysis.
 
 
          ¶92
 Notwithstanding the foregoing, at oral argument, the People
 argued, for the first time, that Lulei was not in custody and
 that therefore Edwards does not actually apply. In
 so arguing, the People cited case law that they had not cited
 in any of their briefs, thereby ambushing Lulei's
 counsel.
 
 
          ¶93
 Thereafter, Lulei requested supplemental briefing to address
 the issues newly raised at oral argument. We granted his
 motion and received simultaneous supplemental briefs from
 both parties.
 
 49
 
          IL
 Analysis
 
 
          ¶94
 I begin by addressing the party presentation principle and
 whether, in the circumstances presented, the People waived or
 abandoned their contention that Lulei was not in custody and
 that therefore Edwards does not apply here. After
 concluding that the People waived or abandoned this
 contention, I address the question that the People raised in
 their initial briefing before us.
 
 
          A.
 The Party Presentation Principle, Waiver, and
 Abandonment
 
 
          ¶95
 The Supreme Court has stated:
 
 
 In our adversary system, in both civil and criminal cases, in
 the first instance and on appeal, we follow the principle of
 party presentation. That is, we rely on the parties to frame
 the issues for decision and assign to courts the role of
 neutral arbiter of matters the parties present. To the extent
 courts have approved departures from the party presentation
 principle in criminal cases, the justification has usually
 been to protect a pro se litigant's rights. But
 as a general rule, "[o]ur adversary system is designed
 around the premise that the parties know what is best for
 them, and are responsible for advancing the facts and
 arguments entitling them to relief."
 
 
 Greenlaw v. United States, 554 U.S. 237, 243-44
 (2008) (alteration in original) (footnote and citation
 omitted) (quoting Castro v. United States, 540 U.S.
 375, 386 (2003) (Scalia, J., concurring in part and
 concurring in the judgment)).
 
 
          ¶96
 In light of this settled law, we have long recognized
 "the basic principle of appellate jurisprudence that
 arguments not advanced on appeal are generally deemed
 waived." Moody v. People, 159 P.3d 611, 614
 (Colo. 2007). It has likewise long been settled that a party
 may lose its right to assert an issue on appellate
 
 50
 
 review "when it has made contrary assertions in the
 courts below, when it has acquiesced in contrary findings by
 those courts, or when it has failed to raise such questions
 in a timely fashion during the litigation." Steagald
 v. United States, 451 U.S. 204, 209 (1981); see also
 Compos v. People, 2021 CO 19, ¶ 35, 484 P.3d 159,
 165 (acknowledging the force of the defendant's argument
 that a court of appeals division had erred in adopting a new
 crime exception to Miranda when no party had
 advocated for such an exception, but not deciding that
 issue).
 
 
          ¶97
 And in cases dating back nearly a century, we and divisions
 of our court of appeals have consistently said that arguments
 not pursued on appeal or not briefed are deemed abandoned.
 See, e.g., In re Stanley, 2025 CO 51, ¶ 17 n.3,
 576 P.3d 171,178 n.3; People v. Smith, 2024 CO 3,
 ¶ 18, 541 P.3d 1191,1195; CenCor, Inc. v.
 Tolman, 868 P.2d 396,397 n.l (Colo. 1994);
 Nicoloffv. Bloom Land & Cattle Co., 66 P.2d 333,
 334 (Colo. 1937); Armed Forces Bank, N.A. v. Hicks,
 2014 COA 74, ¶ 38, 365 P.3d 378, 386; In re Marriage
 of Marson, 929 P.2d 51, 54 (Colo.App. 1996). Indeed, in
 my almost eighteen years as an appellate judge, I have read
 numerous briefs in which the People have asserted this very
 argument against criminal defendants. As I have written
 previously, "(A]rguments regarding waivers and
 forfeitures do not operate solely against criminal
 defendants; they work both ways." People v.
 Rigsby, 2020 CO 74, ¶ 47, 471 P.3d 1068, 1079
 (Gabriel, J., dissenting).
 
 51
 
          ¶98
 Here, as noted above, in their opening and reply briefs
 before us, the People framed their appellate issue based on
 the premise that Lulei was in custody during the
 interrogations at issue and that Edwards applied. At
 no time in either their opening or reply briefs did the
 People even suggest that Lulei might not have been in
 custody. And this is so even though, as the plurality points
 out, Pl. op. ¶¶ 10-13, 33, 60, the issue of whether
 Lulei was in custody was discussed in the trial court.
 Accordingly, the People were aware of a potential issue
 regarding whether Lulei was in custody, but they chose not to
 raise that issue in their initial briefing before us, despite
 the fact that it was their own interlocutory appeal and they
 controlled the issues to be raised.
 
 
          ¶99
 Under the long-settled principles of law set forth above, I
 would conclude that by not advancing any argument in their
 initial briefs that Lulei was not in custody and therefore
 Edwards does not apply (indeed, by taking precisely
 the opposite position), the People waived or abandoned any
 such argument. Assuredly, if, as we have recently concluded,
 a defendant waives an objection to the belated setting of
 restitution by impliedly requesting that the trial court set
 restitution after the statutory deadline for doing so,
 see Babcock v. People, 2025 CO 26, ¶ 30, 569
 P.3d 850, 856, then the People must likewise be deemed to
 have waived an argument when their briefing took a
 diametrically opposed position to the one that they
 subsequently took for the first time in oral argument.
 
 52
 
          ¶100
 I am not persuaded otherwise by the fact that the People
 presented their new position at oral argument, while the case
 was still under our consideration. To my knowledge, we have
 never previously concluded that a party that has waived or
 abandoned an argument can resurrect it by reversing course
 and presenting the waived or abandoned contention at oral
 argument. To allow a party to do so subverts the orderly
 appellate process established by our case law and appellate
 rules and invites appellate advocacy by ambush. Indeed, the
 plurality implicitly condones such a practice when it uses
 against Lulei statements regarding the issue of custody that
 his counsel made at oral argument after being ambushed.
 See Pl. op. ¶ 16 &n.4. The plurality does
 so notwithstanding the fact that when Lulei's counsel
 filed his supplemental brief, after being given an
 opportunity to consider the question appropriately, he
 corrected his prior statements and argued that Lulei was, in
 fact, in custody. In my view, condoning the People's
 taking a contrary position in oral argument from the one that
 they took in all of their briefing before us while
 simultaneously using against Lulei a statement that his
 counsel made after being surprised at oral argument (but that
 he later corrected) is inconsistent and manifestly unjust.
 
 
          ¶101
 Nor can I subscribe to the plurality's approach based on
 our obligation to "ascertain controlling law."
 Id. at ¶¶ 26, 31. This case does not
 present any question regarding the "controlling
 law" because the parties agree on the law.
 
 53
 
          Thus,
 addressing the issue that the parties initially briefed
 (i.e., whether the People had scrupulously honored
 Lulei's unambiguous invocation of the right to counsel)
 would do no violence to the law. And if it were the case that
 we have an obligation to reach the result that we believe to
 be the correct one, regardless of what the parties argued,
 then we would never be bound by what the parties argue, and
 the party presentation principle would cease to exist.
 
 
          ¶102
 On this point, I take no comfort from the plurality's
 apparent attempt to cabin its novel approach to the
 circumstance in which the newly raised issue is allegedly
 antecedent to and ultimately dispositive of the issue before
 the court. Id. at ¶¶ 23, 32-36. In support
 of this effort, the plurality principally relies on
 United States National Bank of Oregon v. Independent
 Insurance Agents of America, Inc., 508 U.S. 439, 447
 (1993), and People v. Kutlak, 2016 CO 1, 364 P.3d
 199. But neither of those cases applies here.
 
 
          ¶103
 United States National Bank, 508 U.S. at 447-48,
 involved a question as to the very existence of the statute
 at issue. There, trade associations representing insurance
 agents challenged a decision by the Comptroller of the
 Currency relying on a 1916 statute to permit certain banks to
 sell insurance to a particular class of customers.
 Id. at 443-44. The Comptroller allowed the
 petitioner bank to do so, and the trade associations
 challenged that ruling, contending that the Comptroller's
 determination was inconsistent with the statute. Id.
 In the course
 
 54
 
 of the proceedings in the trial and intermediate appellate
 courts, an issue arose as to whether the statute had, in
 fact, been repealed. Id. at 444. Although the trade
 associations did not make such an argument, the court of
 appeals concluded that the statute had been repealed (thus
 undermining the Comptroller's decision), and the Supreme
 Court granted the bank's petition to review that
 determination. Id. at 444-45. It is in this context
 that the Court addressed whether the statute's repeal was
 properly before the intermediate appellate court.
 Id. at 447. Specifically, the Court observed that
 the appellate court could, in the exercise of its discretion,
 address an issue that was antecedent to and ultimately
 dispositive of the dispute before it because "[t]here
 can be no estoppel in the way of ascertaining the existence
 of a law." Id. at 447-48 (alteration in
 original) (quoting Town of S. Ottawa v. Perkins, 94
 U.S. 260, 267 (1876)). In other words, it was perfectly
 appropriate for the appellate court, in the circumstances
 before it, to determine whether the statute at issue was even
 in effect.
 
 
          ¶104
 United States National Bank is, thus,
 distinguishable from the present case. That case, unlike the
 one before us, directly involved a scenario in which the
 courts were required to ascertain the controlling law. (The
 Court ultimately determined that the statute at issue had
 not, in fact, been repealed. Id. at 462-63.) As
 noted above, the present case poses no such question. All
 parties agree on the controlling
 
 55
 
 law. The only issue is the application of the law to the
 facts before us, a matter of error correction, not
 ascertainment of the applicable law.
 
 
          ¶105
 Kutlak likewise does not support the plurality's
 contention that it may properly address any issue that it
 deems antecedent to the question presented, even if the issue
 was waived. In Kutlak, ¶¶ 6-7, 364 P.3d at
 202, the trial court denied Kutlak's motion to suppress
 statements that he had made in the course of a custodial
 interrogation, and a division of the court of appeals
 reversed, concluding that Kutlak had unambiguously invoked
 his right to counsel and did not reinitiate further
 communications. We granted certiorari solely on the question
 of whether Kutlak had reinitiated communications, but we
 ultimately concluded, instead, that he had not unambiguously
 invoked his right to counsel. Id. at ¶¶ 3,
 8 n.2, 364 P.3d at 201, 202 n.2. We therefore reversed the
 division's judgment, id. at ¶ 3, 364 P.3d
 at 201, reaching that conclusion even though (1) we did not
 grant certiorari on the question of whether the
 defendant's invocation was unambiguous; (2) the People
 had conceded at every stage of the proceedings that the
 defendant's invocation was sufficient; and (3) no party
 had briefed the invocation question until we sua sponte
 requested supplemental briefing after the case was at issue,
 id. at ¶ 35, 364 P.3d at 208 (Gabriel, J.,
 dissenting).
 
 
          ¶106
 Kutlak, too, is distinguishable. We began our
 analysis by noting that we generally have discretion to
 affirm a trial court's suppression ruling on different
 
 56
 
 grounds from those on which the trial court had relied.
 Id. at ¶ 11, 364 P.3d at 203 (majority
 opinion). That principle does not apply here, however,
 because in this case, we are reversing the trial
 court's ruling. Nor did Kutlak involve a
 question of waiver or this Court's ability to resurrect
 an issue that a party had previously waived. (As noted above,
 although the People in that case had conceded a sufficient
 invocation of the right to counsel, the People did not
 initiate a contrary argument in this court; a majority of
 this court did so on its own.) And, respectfully, I am not
 persuaded by the fact that, in a single case decided a decade
 ago, a majority of this court departed from the ordinary
 appellate process, as it does in an arguably even more
 expansive way today. I believed that we were wrong to do so
 then, see id. at ¶¶ 33-40, 364 P.3d at
 208-09 (Gabriel, J., dissenting), and I believe that we
 should not do so now, particularly given that we have not
 been consistent in so departing from our settled rules of
 procedure. (The present case provides one illustration of
 such an inconsistency. Here, the plurality repeatedly points
 out that Lulei allegedly conceded in the trial court that he
 was not in custody, and it uses that concession to justify
 ruling for the People, despite the fact that the People did
 not raise any issue regarding custody in their initial
 briefing before us. Pl. op. ¶¶ 33, 60. In
 Kutlak, however, the People conceded in
 both the trial court and on appeal that Kutlak had
 unambiguously invoked his right to counsel, but the majority
 effectively disregarded that concession and ruled
 
 57
 
 that Kutlak had not, in fact, unambiguously invoked that
 right. Kutlak, ¶¶ 7, 32, 364 P.3d at 202,
 207. If the People's prior concessions in Kutlak
 became irrelevant once we ordered supplemental briefing, then
 Lulei's prior concessions should be treated the same way
 here.)
 
 
          ¶107
 Finally, I do not believe that it is fair or appropriate to
 use against Lulei the fact that he was forced to seek
 supplemental briefing after being ambushed during oral
 argument. See Cone. op. ¶¶ 63, 67. After
 the People raised the custody issue for the first time at
 oral argument, a number of my colleagues expressed obvious
 interest in that issue during the argument. As a result,
 Lulei had no choice but to seek a reasonable opportunity to
 respond. Regardless, I take no solace in the fact that the
 parties were offered the opportunity to file supplemental
 briefs. If we can cure all waivers, abandonments, and party
 presentation problems simply by authorizing supplemental
 briefs, then those important doctrines will be rendered
 meaningless, at our discretion.
 
 
          ¶108
 Notwithstanding the plurality's effort to downplay the
 nature of its ruling in this case, see Pl. op.
 ¶ 60,1 believe that the harm to heretofore settled
 principles of party presentation, waiver, and abandonment
 that the plurality's opinion would engender is manifest
 and significant. If it can be said that the question of
 whether Lulei was in custody for Edwards purposes
 was properly before us because this case related to an
 alleged Edwards violation and the issue of custody
 
 58
 
 was antecedent to Edwards's application, then
 there is no longer any limit to what a party can argue after
 filing its briefs. This is so because creative lawyers will
 inevitably be able to develop an argument as to how a newly
 raised assertion was related and somehow antecedent to a
 different contention that they actually presented. In
 addition, allowing parties to change their approach in this
 way would be inconsistent with the long line of authority
 providing that objecting on one ground does not preserve an
 objection on another ground. See Udemba v. Nicoli,
 237 F.3d 8, 14-15 (1st Cir. 2001) ("It is a bedrock rule
 that a party who unsuccessfully objects to the introduction
 of evidence on one ground cannot switch horses in midstream
 and raise an entirely new ground of objection on appeal. . .
 ."); People v. Rogers, 2012 COA 192, ¶ 24,
 317 P.3d 1280,1284 ("An issue is unpreserved for review
 when an objection or request was made to the trial court, but
 on different grounds than those raised on appeal.").
 
 
          ¶109
 For these reasons, I would conclude that by not advancing in
 their initial briefing an argument that Lulei was not in
 custody and therefore Edwards did not apply, the
 People waived or abandoned that argument. I would therefore
 limit our analysis to the issue that the parties actually
 briefed, namely, whether the People had scrupulously honored
 Lulei's invocation of his right to counsel and whether
 Lulei had reinitiated the interrogation.
 
 
          ¶110
 I turn to that question next.
 
 59
 
          B.
 Edwards
 
 
          ¶111
 The Fifth Amendment guarantees the right to counsel in the
 course of a custodial interrogation. Miranda, 384
 U.S. at 469; Leyba v. People, 2021 CO 54, ¶ 12,
 489 P.3d 728, 732.
 
 
          ¶112
 In Edwards, 451 U.S. at 483-85, the Supreme Court
 opined that when a suspect invokes the right to counsel,
 interrogation must cease until counsel is made available or
 the suspect voluntarily reinitiates communications with the
 police and knowingly and intelligently waives his rights.
 
 
          ¶113
 To invoke the right to counsel, a suspect's request for
 counsel must be clear and unambiguous. See Leyba,
 ¶ 13, 489 P.3d at 732. Upon a suspect's clear
 invocation of the right to counsel, police must
 "scrupulously honor []" the request and cease
 questioning until counsel has been provided. People v.
 Wood, 135 P.3d 744, 753 (Colo. 2006); accord
 Edwards, 451 U.S. at 484-85; Miranda, 384 U.S.
 at 473-74. This bright-line rule exists to "prevent
 police from badgering a defendant into waiving his previously
 asserted right to counsel." Kutlak, ¶ 14,
 364 P.3d at 204.
 
 
          ¶114
 Once the police cease interrogation upon a suspect's
 invocation of the right to counsel, the suspect may
 nonetheless subject himself to additional interrogation by
 "initiat[ing] further communication, exchanges, or
 conversations with the police." Edwards, 451
 U.S. at 484-85. To reinitiate questioning, however, the
 
 60
 
 suspect's comments must'" evince [] a
 willingness and a desire for a generalized discussion about
 the investigation,' and not merely question the reasons
 for custody." People v. Martinez, 789 P.2d 420,
 422 (Colo. 1990) (alteration in original) (quoting Oregon
 v. Bradshaw, 462 U.S. 1039,1045-46 (1983) (plurality
 opinion)).
 
 
          ¶115
 Here, no party disputes that Lulei clearly and unambiguously
 invoked his right to counsel. The question thus becomes
 whether the police then scrupulously honored that invocation
 and, if they did, whether Lulei reinitiated the questioning.
 
 
          ¶116
 Like the trial court, I would conclude that the police did
 not scrupulously honor Lulei's invocation of his right to
 counsel. As noted above, when Lulei invoked his right and
 asked to reschedule for a time when he could have a lawyer
 present, Detective Bolton initially said that they could do
 that. The detective, however, did not allow Lulei to leave.
 Instead, the detective ordered Lulei to wait, walked outside,
 and returned with Detective Sandoval and a uniformed officer
 to arrest Lulei. Predictably, Lulei expressed surprise, and
 he inquired as to what was happening. Contrary to the
 People's position, the law enforcement officers did not
 merely answer Lulei's question. Instead, they repeatedly
 used his invocation of his Fifth Amendment rights against
 him. For example, when an exasperated Lulei offered to talk
 about what was happening, Detective Sandoval responded,
 "Nope, you had your chance, and you asked for a lawyer.
 We can't do it now." Detective Bolton then added,
 "I tried to talk to you smoothly, man, and hear your
 
 61
 
 side of it." And when Lulei expressed his understanding
 that he would be free to leave. Detective Bolton replied,
 "No one told you that, and also, I tried to get your
 side of the story and figure it out, man, and you didn't
 want to talk."
 
 
          ¶117
 In my view, this is the antithesis of scrupulously honoring
 Lulei's invocation of the right to counsel. Indeed, it is
 precisely the type of badgering of a defendant into waiving
 his previously asserted right to counsel that the
 bright-line, "scrupulously honor" rule seeks to
 prevent. See Kutlak, ¶ 14, 364 P.3d at 204. The
 police expressly used Lulei's invocation of his Fifth
 Amendment rights against him and announced that they were
 arresting him for murder, apparently to provoke him into
 waiving his rights, which, unsurprisingly, he did. See
 also People v. Cerda, 2024 CO 49, ¶ 32 &n.3,
 559 P.3d 206, 213-14, 213 n.3 (concluding that the police did
 not scrupulously honor the defendant's unambiguous and
 repeated invocations of his right to counsel when, after the
 defendant's invocations, the police told him that he
 would be charged with murder, knowing or reasonably
 anticipating in the circumstances presented that continuing
 the interrogation in this manner was likely to elicit an
 incriminating response). In my view, this was a blatant
 violation of Edwards and its progeny, and for that
 reason alone, I would affirm the trial court's
 suppression order.
 
 
          ¶118
 Even were I to proceed to the question of whether Lulei
 reinitiated the interrogation, I perceive no such
 reinitiation here. Lulei was obviously surprised
 
 62
 
 by the turn of events, having just been told that the
 interview would be rescheduled for a time when he could have
 a lawyer present, and he initially did nothing more than
 question the reasons for his custody. As noted above, this
 type of question does not constitute reinitiation. See
 Martinez, 789 P.2d at 422. It was only after the police
 threatened Lulei that he, under duress, sought to engage in
 further dialogue. In no way do such circumstances constitute
 the kind of voluntary reinitiation of conversation envisioned
 by the above-described case law. ¶119 Accordingly, like
 the trial court, I would conclude that after Lulei clearly
 and unambiguously invoked his right to counsel, the police
 did not scrupulously honor that invocation and Lulei did
 nothing to reinitiate conversation so as to establish an
 intentional, knowing, and voluntary waiver of his rights.
 
 
          III.
 Conclusion
 
 
          ¶120
 For these reasons, I would conclude that the People waived or
 abandoned any argument that Lulei was not in custody and that
 Edwards therefore does not apply on the facts
 presented. Addressing, then, only the argument that the
 People properly presented to us, which presumed
 Edwards's applicability, I would further
 conclude that the police did not scrupulously honor
 Lulei's clear and unambiguous invocation of his right to
 counsel, as Edwards required. I would therefore
 affirm the trial court's order suppressing Lulei's
 statements to the detective.
 
 
          ¶121
 Accordingly, I respectfully dissent.
 
 
 ---------
 
 
 Notes:
 
 
 [1] We derive the facts from the
 transcript of the hearing on the motion to suppress and from
 our review of body-worn camera footage and the video- and
 audiorecorded events from the police interview room.
 
 
 [2] The parties dispute how long Lulei
 waited before he was brought to the interview room. Lulei
 contends it was at least forty-five minutes, while Detective
 Bolton testified at the suppression hearing that it was less
 than fifteen minutes.
 
 
 [3] The People raised a single
 issue:
 
 
 Whether the district court erred in suppressing the
 defendant's statements.
 
 
 [4] When asked if the record showed that
 Lulei was not in custody, defense counsel replied, "I
 don't think I can in good faith make the argument that
 [Lulei] was in fact -or felt like he was -restrained, or not
 free to leave, until after he invoke[d] the right to
 counsel."
 
 
 [5] Pursuant to C.A.R. 4.1(a), the People
 certify that this appeal is not taken for the purpose of
 delay and that the suppressed evidence constitutes a
 substantial part of the People's case against Lulei.
 Lulei does not object to this certification.
 
 
 [6] It is unclear what "right"
 or "privilege" Lulei believes the People are
 relinquishing by omitting argument on the custody
 issue.
 
 
 [7] We also note that our consideration of
 custody in this case does not give rise to concerns of
 unfairness or surprise. Here, the district court (and defense
 counsel) addressed the custody issue at the suppression
 hearing, the People raised it at oral argument to this court,
 where defense counsel had the opportunity to respond at some
 length, and both parties addressed it in supplemental
 briefing at Lulei's request. The latter two circumstances
 provide us with an even stronger basis to address the custody
 issue than we had in Kutlak, where we raised the
 invocation issue at oral argument and sua sponte requested
 supplemental briefing.
 
 
 [8] The Colorado Constitution provides a
 similar privilege against self-incrimination. Colo. Const,
 art. II, § 18.
 
 
 [1] The orders were issued before I joined
 this court.
 
 
 ---------